IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA and ITS LOCAL UNION 444 | : : : : : | |
| v. | : : : : | Civil No. CCB-09-3136 |
| ANTHONY BOGUES and TERRIL ELLISON | : : | |

## MEMORANDUM

Plaintiffs International Union, Security, Police, and Fire Professionals of America and its Local Union 444 (collectively, "the Union") filed this action against defendants Anthony Bogues and Terril Ellison alleging that, as former officers of the Union, they misappropriated funds in breach of their fiduciary duty. The Union has filed a motion for summary judgment. For the reasons set forth below, the motion will be granted.

## BACKGROUND

Bogues and Ellison were members of Local 444 as security officers for Wackenhut Services, Inc. assigned to Fort Meade. In early 2009, Local 444's Fort Meade members voted to create an independent local chapter, and the International Union established Local 282 for five work sites, including Fort Meade. Following the creation of Local 282, Bogues was elected president and Ellison was elected secretary-treasurer. To help establish the new local, the International Union sent Bogues and Ellison between ten and fifteen thousand dollars in funds. (*See* Pls.' Mot., Exs. 5 & 6, ECF Nos. 52-6 & 52-7). The defendants also were provided a copy of the union's Financial Officers Handbook and, by letter, given basic instructions on the need to document expenditures and issue tax documents for lost time paid by the local.

1

Article XXXIII of the Union's Constitution states that "[t]he funds of each Local Union shall be used to defray all necessary expenses which must be approved by the Local Union in regular meetings[,]" (Pls.' Mot., Ex. 7, ECF No. 52-8, at 17), but the document does not define the term "regular meeting" or the procedural requirements for such approvals. The Union's Financial Officers Handbook similarly authorizes the use of local funds only for "necessary and appropriate" expenses. (Pls.' Mot, Ex. 14, ECF No. 52-15, at 17-18).

Over the few months they were in office, throughout the summer of 2009, Bogues and Ellison expended over $15,000 of Local 282's funds. They assert that each and every expenditure was legitimate and approved by the local's executive board, but they have produced only two handwritten documents as evidence of such meetings. (*See* Pls.' Mot., Exs. 8 & 11, ECF Nos. 52-9 & 52-12). On May 16, 2009, Local 282's executive board met and approved the purchase of "computers and software for Treasury or President" and "cell phones for chief shop stewards on each site." Ellison subsequently spent $4000 at the Apple Store on a laptop, an iPhone, and bookkeeping software. (Pls.' Mot., Ex. 9, ECF No. 52-10). Bogues purchased a $270 BlackBerry phone. (Pls. Mot., Ex. 10, ECF No. 52-11). A second executive board meeting was held on August 1, 2009. The only business apparently conducted at this meeting was the approval of $500 a month stipends, retroactive to July 1, 2009, for Bogues and Ellison. (Ex. 11). Bogues and Ellison each paid themselves $1500 ($3000 total) in stipends over the next few months. (Pls.' Mot., Ex. 12, ECF No. 52-13).

Aside from these allegedly approved transactions, Bogues and Ellison conducted a variety of other questionable transactions as to which they have adduced no evidence that the transactions were approved by the union. On June 16, 2009, they spent $143 in union funds on lunch together at McCormick and Schmick's without justification. (*See* Pls.' Mot., Ex. 3, ECF

No. 52-4, at 144-47). On July 28, 2009, they withdrew $8,550 in cash from the bank, nearly all of Local 282's remaining funds, in order to "protect" the funds from being reclaimed by the International Union. (*See* Pls.' Mot., Exs. 2 & 3, ECF Nos. 52-3 at 72-79 & 52-4 at 91-92). Ellison was reimbursed $129.33 from the union for part of a Comcast bill that included television, voice, and data services. (Pls.' Mot., Ex. 20, ECF No. 52-21). They also spent an unapproved $1694.68 on catering services for three meetings, (Pls.' Mot., Ex. 21, ECF No. 52-22), and $2500, in cash, on "bookkeeping services" despite their previous purchase of $300 bookkeeping software. It is also notable that the financial transactions for Local 282 that occurred during this time fit on one page. (*See id.*, Ex. 6).

Finally, Bogues and Ellison were disbursed an unjustified series of "lost time" vouchers that are supposed to be used only to reimburse union officers for loss of pay due to performing union activities. (*See* Defs.' Opp., Ex. A, ECF No. 74-1, at 6-14). Bogues approved the vouchers for Ellison, and, likewise, Ellison signed Bogues's vouchers. (*Id.*) The Union's Financial Officers Handbook expressly states that an example of an inappropriate expenditure would be "[p]ayment of lost time when no lost time (from work) has occurred." (Pls.' Mot., Ex. 14, at 17-18). Nevertheless, Bogues and Ellison do not dispute that they each received hundreds of dollars in lost time payments, in cash, when they were not scheduled to work and where they lost no time. (Pls. Mot., Exs. 16 & 17, ECF No. 52-17 & 52-18). In fact, Ellison was receiving workers compensation payments on the days he received "lost time" payments. Bogues and Ellison defend the payments by alleging that they were approved by a regional union official, but not that they were otherwise valid under union guidelines. Most egregiously, Ellison charged the union for 60 hours in lost time between June 18th and July 23rd, 2009, but claims that any records or documents that could explain the work he conducted on behalf of the union during that time

were erased, six months after this suit was filed, before he turned his laptop over to the Union. (*Id.*, Ex. 3 at 93-94, 104-05, 113-114).

On September 2, 2009, the NLRB conducted an election at the Wackenhut Fort Meade bargaining unit, and the International Union was disaffiliated from that unit in favor of a rival union. As a result, Bogues and Ellison, along with their immediate co-workers, joined the new union, and the other four work sites affiliated with Local 282 merged back into Local 444. Bogues and Ellison were, at that time, instructed to turn over all books, records, and property to the Union, as required by Article XXVII of the Union Constitution, (*Id.*, Ex. 7, at 15), but they refused to return any of the phones, computer equipment, or other items they purchased during their time in office. The Union filed this suit in November 2009, alleging breach of fiduciary duty under the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501, and state law, as well as breach of contract and common law conversion. On May 17, 2010, Bogues and Ellison finally returned the computer equipment they had purchased. They had not turned over any financial records until April 22, 2010. Neither defendant turned over their cell phones until August 2010. Ellison continued to use his union cell phone until it was turned over; Bogues could not remember if he continued using it, and he never returned his phone's SIM card, which would contain its usage data. (Pls.' Mot., Ex. 2, ECF No. 52-3, at 152-56; Ex. 3 at 111-12). Bogues and Ellison also admit that they erased all the data off the laptop and their phones before returning them to the Union. (*Id.*, Ex. 3 at 115-16).

## ANALYSIS

### I. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

**II. Jurisdiction under § 501**

The Union primarily alleges that Bogues and Ellison violated 29 U.S.C. § 501(a), which states:

> The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and

5

> bylaws and any resolutions of the governing bodies adopted thereunder, . . . and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization.

Bogues and Ellison argue that the Union does not have standing under this provision because § 501 contains only an express right of action for individual union members. *See* § 501(b) (providing that where an officer "is alleged to have violated the duties declared in subsection (a) and the labor organization . . . refuse[s] or fail[s] to sue or recover damages[,]" an individual union member "may sue such officer"). Although some courts have held that § 501(b) forecloses any right for a union to sue directly under § 501(a), *see Building Material and Dump Truck Drivers v. Traweek*, 867 F.2d 500, 506-07 (9th Cir. 1989), the more logical reading of the statute is that, because the individual cause of action under § 501(b) requires a union first to have "refused" to bring suit on its own behalf, § 501(a) contains an implied right of action for unions themselves. *See Int'l Union of Operating Engineers v. Ward*, 563 F.3d 276, 282-89 (7th Cir. 2009) (likening § 501(b)'s cause of action to a shareholder derivative suit); *Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. Statham*, 97 F.3d 1416, 1421 (11th Cir. 1996);[1] *Int'l Longshoremen's Ass'n v. Virginia Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1339-40 (E.D. Va. 1996). Furthermore, the Fourth Circuit has explained that § 501(a) "assigns to the federal courts the duty to fashion a body of federal law defining the fiduciary duties of union officers[,]" presumably by establishing federal jurisdiction to hear cases alleging breaches of

---

[1] "Here, section 501(b) clearly shows that it has not one, but two purposes: first, to enable individuals to sue on the union's behalf, and second, to make sure that individuals do not preempt a union's right to prosecute its own claims. Section 501(b) itself makes the first purpose subservient to the second. We should not infer from the mention of individual suits that Congress did not intend to give unions a cause of action. It is far more in keeping with the statute as a whole to conclude that, having given the unions certain rights, Congress thought it implicit that the unions could enforce those rights in court. Allowing the individuals to assert the unions' claims was more extraordinary and therefore had to be spelled out." *Statham*, 97 F.3d at 1421.

6

such duties. *See Brink v. DaLesio*, 667 F.2d 420, 424 (4th Cir. 1981). It is unlikely that Congress would assign this task only where a union has elected *not* to sue an allegedly faithless officer, but then another individual union member has. *See Ward*, 563 F.3d at 288 ("It would be anomalous indeed to read this statutory scheme as remitting the union's own suit—which is primary under the statutory hierarchy—to state court.").

Bogues and Ellison argue that, at least under *Ward*, a suit under § 501(a) would only be permissible where it was brought "on behalf" of union membership and not on behalf of the union itself. They suggest that the International Union and Local 444 here have no standing because the defendants allegedly misappropriated funds from the short-lived Local 282, which split off from Local 444 before they became officers. But, the defendants do not dispute that four of Local 282's five work sites merged back into Local 444. Thus, the Union's suit is "on behalf" of, locally, four-fifths of the membership Bogues and Ellison presided over as officers, and the protection of those members' rights can be vindicated by the International Union and Local 444. More importantly, the defendants have not pointed to any authority suggesting that local officers, where they misappropriate local funds, have not also breached a fiduciary duty to their union as a whole under § 501(a), which establishes a federal fiduciary duty both "to such organization" and, separately, to "its members as a group."

### III. Liability under § 501

Thus, the Union appropriately seeks damages for Bogues's and Ellison's use of union funds as officers under § 501(a), which "constitutes union officials trustees and requires them to act in conformity with the union constitution and bylaws." *Brink*, 667 F.2d at 424. "In cases where a union official profits personally through the use or receipt of unions funds . . . the official bears the burden of proving that the transaction was validly authorized in accordance

with the union's constitution and bylaws after adequate disclosure, and that it does not exceed a fair range of reasonableness." *Id.* (citing *Morrissey v. Curran*, 650 F.2d 1267, 1274-75 (2d Cir. 1981)). In addition, even if an official did not enjoy a "direct, personal benefit" from an expenditure, if a challenged expenditure is shown to have been "unauthorized," the court may conclude it "was so unreasonable as to constitute a breach of fiduciary duty under section 501." *Council 49, Am. Fed. Of State, County and Mun. Employees Union v. Reach*, 843 F.2d 1343, 1347 (11th Cir. 1988).

It is undisputed that Ellison and Bogues were officers within the meaning of § 501. Under *Brink*, the court must determine whether Bogues and Ellison "profit[ed] personally" from the challenged uses of union funds. *See In re Johnson*, 139 B.R. 163, 172-73 (Bankr. E.D. Va. 1992) (citing *Brink*, 667 F.2d at 424). If so, Bogues and Ellison then bear the burden of demonstrating both that each transaction was validly authorized and that each was reasonable. *Id.* Importantly, and despite Bogues's and Ellison's insistence that every challenged transaction was approved by Local 282's executive board, authorization is not a complete defense. *See Morrissey*, 650 F.2d at 1272 ("For that would permit a union constitution to vest limitless spending power in union officers and, even where membership vote is required, leave dissenting members powerless to halt abusive practices. Such a result could not have been intended by a Congress anxious to curb the wide-scale corruption among union officials[.]"); *see also Johnson*, 139 B.R. at 172. Furthermore, if the court determines that a challenged transaction did not benefit Bogues and Ellison personally, but that it was nonetheless unauthorized under union rules, the court must assess whether it exceeded a fair range of reasonableness.

The Union has challenged the following categories of expenditures by Bogues and Ellison: (1) lost time vouchers; (2) monthly stipends; (3) bookkeeping expenses; (4) meals and

catering; and (5) technology and related services. As explained below, the Union has adduced undisputed evidence for each of these categories of transactions, except for the technology and related services, that they were breaches of Bogues's and Ellison's fiduciary duty to the union under § 501(a). Accordingly, the Union is entitled to judgment as a matter of law on its § 501 claim.[2]

**1. Lost Time Vouchers**

There is no question that Bogues and Ellison profited personally from the hundreds of dollars in lost time vouchers they signed for one another. Thus, they must demonstrate that each was validly authorized and that each was reasonable. In support of these payments, Bogues and Ellison have submitted an affidavit from a former regional union director who states that he "verbally approved" each lost time voucher with "full knowledge that the work [the defendants] performed was on a day [they were] not scheduled to work." (Def.'s Opp., Ex. A, ECF No. 74-1 ¶ 16). But, Bogues and Ellison can point to no union bylaw or guideline that justifies their reliance on this individual, and the union's rules on lost time payments are clear. (*See* Ex. 14 at 17). In fact, the first three "examples of inappropriate expenditures" in the union's financial handbook involve payment of lost time "to persons who have not performed services for the Union"; "when no lost time (from work) has occurred"; or "[o]verpayment of lost time (exceeding the actual work time lost) and/or exceeding the actual hourly wage rate." (*Id.*)[3] The defendants do not dispute that the lost time they received violated these provisions. Thus, these

---

[2] Because the Union is entitled to an adequate remedy under its § 501 claim, the court declines to reach its breach of contract and state law fiduciary duty claims.

[3] The defendants claim that they never received the handbook and had no knowledge of its contents, but ignorance of a union's "constitution and bylaws and any resolutions of the governing bodies adopted thereunder" cannot be a defense under § 501(a). Union officials charged with fiduciary obligations have an affirmative duty to learn and uphold the requirements of their office.

9

payments were not "validly" authorized by the union. *See Brink*, 667 F.2d at 424. Lost time payments are only legitimate where they are compensation for, by definition, "lost time." Accordingly, Bogues and Ellison have failed to demonstrate that these payments were reasonable and the court finds, as a matter of law, they breached their fiduciary duty to the union and its members by approving each other's invalid lost time vouchers and receiving such funds.

### 2. Monthly Stipends

Similarly, with even less justification, Bogues and Ellison rely on a document purporting to be minutes from an executive committee meeting, (Pls.' Mot, Ex. 11), to justify their receipt of, collectively, $3000 in monthly cash "stipends." Even if the approval of this expenditure by a five person executive committee is sufficient under the Union's Constitution, which does not specify the exact procedures required for a local to approve spending, the stipend payments were unreasonable. The union authorizes the use of local funds only for "necessary and appropriate" expenses. (*See id.*, Ex. 7 at 17, Ex. 14 at 17). The payment of stipends without any lost time or other basis is neither necessary nor appropriate for union business, and the defendants make no attempt to otherwise justify the payments nor have they adduced any evidence that the Union ever paid other officers within their capacities any salary or stipend. The stipends represent precisely the kind of "manifestly unreasonable" payments that § 501(a) was enacted to prevent. *See Council 49*, 843 F.2d at 1348.

### 3. Bookkeeping Services

The Union next challenges Bogues's and Ellison's payments, apparently in cash, of $2500 in bookkeeping services to "Adewumi Bookkeeping Services." (*See* Ex. 6). While these payments are suspicious in light of the simplicity of Local 282's finances at the time and the defendants' separate purchase of expensive computer equipment and $300 bookkeeping

software, the Union has adduced no evidence that either Bogues or Ellison personally benefitted from these payments. Nevertheless, Bogues and Ellison have not adduced any evidence that these payments were validly authorized by the union membership or the local executive committee. Given that these payments constituted over a *sixth* of Local 282's spending during the months Bogues and Ellison were in charge, and that they do not attempt to justify any need for such expensive bookkeeping, the court finds that this spending, too, was unreasonable and a breach of their fiduciary duty to the Union.

### 4. Meals and Catering

Likewise, while "courts cannot and should not probe into the reasonableness of every union dinner[,]" *Council 49*, 843 F.2d at 1347 n.3 (quotation omitted), excessive spending on business meals can also constitute a breach of an officer's fiduciary duty where it violates union policy or is otherwise unreasonable. *In re Johnson*, 139 B.R. at 177-78. Here, Bogues and Ellison claim that the over $1800 they spent on meals and catering services is justified because they were "discussing union matters, these meals were not social events." (Defs.' Opp., ECF No. 74, at 24). While this may be true, the defendants point to no evidence that any of these meals were approved by anyone, they document no work that was conducted at the meals, and they cite no union guidelines authorizing such lavish spending. Accordingly, the court finds that they personally benefitted from this spending, and that, regardless, the spending was unauthorized and unreasonable. Accordingly, the money the defendants spent on meals was also a breach of their fiduciary duty.

### 5. Technology and Related Services

Finally, however, the Union has not demonstrated that Bogues's and Ellison's purchase of phones, a computer, software, and their single reimbursement of $129 to Ellison for Comcast

services was a breach of their fiduciary duty. Although they may have indirectly benefitted from the use of the cell phones and computer, as well as the payment of a part of Ellison's Comcast bill, the purchase of the equipment—and by extension the payment of the services to use it— appears to have been approved by Local 282's executive committee (at least in part) and otherwise would seem to be a necessary and appropriate use of funds. (Ex. 8). Furthermore, although Bogues's and Ellison's initial Apple Store bill was quite high, their receipt also shows they returned items in June of 2009, which suggests they reassessed their needs and appropriately stewarded the Union's funds. (*See* Ex. 9). Finally, although the math is a bit fuzzy, it appears that Ellison was reimbursed mostly for phone and internet service, which could be used for official business, and not cable television service. Importantly, the Union only reimbursed part of one of Ellison's Comcast bills, suggesting either that the defendants decided it was inappropriate or that he stopped conducting union business at home using these services. In short, the Union has not adduced evidence to support a finding that Bogues's and Ellison's technology purchases were a breach of their fiduciary duty as a matter of law.

## IV. Conversion

The Union also seeks damages under the common law tort of conversion for Bogues's and Ellison's continued unauthorized possession of its chattel (phones, laptop, records) and funds after they ceased being officers and were under a duty to turn over such property to the Union. In Maryland, the common law tort of conversion contains two elements. First, the plaintiff must prove the defendant exerted "any distinct ownership or dominion . . . over the personal property of another in denial of his right or inconsistent with it." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004) (quotation omitted). "This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the

rightful possessor permits." *Id.* Second, the defendant must have "an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 836. "The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." *Id.* Money "is not subject to a claim of conversion" unless the plaintiff seeks to recover specific, segregated currency. *Id.* at 833 n.3.

The Union has demonstrated it is entitled to summary judgment on its conversion claim as to the phones, laptop, and records that Bogues and Ellison continued to possess once they were no longer officers. The oath that they took before entering office expressly states: "Do you hereby pledge . . . [t]o deliver all books, papers, and other property of the Union that may be in your possession at the end of your term, to your successor in office[.]" (Ex. 7 at 15). Bogues and Ellison argue that they were under no obligation to return the laptop and phones they possessed as union officers when their worksite became affiliated with a new union because the property belonged to Local 282, not the International Union or Local 444. But, the Union correctly points out that only the defendants' worksite transferred to the new union. The other four worksites affiliated with Local 282 shortly merged back into Local 444. Under the Union's Constitution, Bogues and Ellison ceased being officers when their union affiliation changed and they were under a duty to return the Union's property to the rest of their local's membership.

Thus, there is no genuine dispute that Bogues and Ellison exercised control over union property long after they possessed a right to it and that they did so intentionally. The defendants argue that their exercise of control was not extensive enough to warrant damages in conversion, but this argument is unavailing. In determining whether an interference with property is sufficiently serious to support a claim of conversion, the court should consider:

the extent and duration of the defendant's exercise of control over the chattel; his intent to assert a right which is in fact inconsistent with the plaintiff's right of control; the defendant's good faith or bad intentions; the extent and duration of the resulting interference with the plaintiff's right of control; the harm done to the chattel; and the expense and inconvenience caused to the plaintiff.

*Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 209 (Md. 1985).

Here, the defendants made no effort to return any of the Union's property or records after it was requested. Only months after this suit was filed did they return anything, and even then, the Union did not receive all of the property it had a right to for several more months. Before it was returned, the defendants erased all of the data on the Union's phones and laptop, and Bogues has never returned his phone's SIM card. Both of the defendants likely used their phones long after they were in office, and, even if there is no direct evidence they acted in bad faith, both defendants were intentionally possessing and using expensive technology purchased with union funds. Accordingly, the Union is entitled to damages for Bogues's and Ellison's conversion of its chattel. As to funds that may have been disbursed to the plaintiffs, however, unspecified currency is not recoverable in a conversion claim, *Darcars*, 841 A.2d at 833 n.3, though such funds are likely recoverable under the Union's fiduciary duty claim, *see, e.g., Brink*, 667 F.2d at 426; *Council 49*, 843 F.2d at 1348-49.

## CONCLUSION

For the reasons stated above, the Union's motion for summary judgment will be granted. Counsel will be contacted to discuss further proceedings related to damages.

A separate Order follows.

|  |  |
|---|---|
| 6/14/13 | /s/ |
| Date | Catherine C. Blake |
|  | United States District Judge |